# United States Court of Appeals
## For the Eighth Circuit

No. 15-1695

United States of America,

*Plaintiff - Appellee*,

v.

Jose Avalos,

*Defendant - Appellant*.

Appeal from United States District Court
for the District of Nebraska - Omaha

Submitted: October 23, 2015
Filed: March 24, 2016

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

COLLOTON, Circuit Judge.

Jose Avalos was convicted of possession with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1). The district court[1] sentenced Avalos to 360 months' imprisonment. Avalos appeals his

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

conviction, arguing that the court improperly admitted expert testimony and that there was insufficient evidence to support a conviction. He also argues that his sentence is unreasonable. We affirm.

I.

The drug charge against Jose Avalos arose from a search of an apartment in February 2013. At the time, police in Council Bluffs, Iowa, were searching for Juan Avalos, Jose's brother, after Juan escaped from a halfway house. A probation officer notified police that Juan was staying with his brother in an apartment in Omaha, Nebraska.

Officer Travis Jarzynka arrived at the apartment and observed a man who matched Juan's description exit the apartment complex, enter a vehicle, and drive away. Jarzynka stopped the car, and the driver identified himself as Jose Avalos. Jose Avalos, whom we will call "Avalos," told Jarzynka that Juan was at his apartment and provided a key to enter the apartment.

Jarzynka and other police officers returned to the apartment and arrested Juan. During a protective sweep of the two-bedroom apartment, officers discovered a handgun and small baggie of methamphetamine in the apartment's northern bedroom. The officers suspected that this bedroom belonged to Juan, because Juan asked the officers to retrieve a jacket and shoes from that room.

Based on the discovery of methamphetamine, investigators obtained and executed a search warrant for the apartment. During the search, the investigators found that the southern bedroom also was occupied. In that bedroom's walk-in closet, the investigators discovered 1.3 kilograms of methamphetamine, a handgun, ammunition, and two cell phones concealed in two speaker boxes. The methamphetamine had a street value of approximately $50,000 to $60,000. Police

also found in the closet a digital scale, a bank deposit receipt for $8,000, and several documents in Jose Avalos's name: tax forms, a birth certificate, a high school-equivalency certificate, and a rental agreement for the apartment. In the bedroom itself, investigators found a photo of Avalos, utility bill, checkbook, satellite-television installation receipt, and furniture delivery receipt. All of these documents bore Avalos's name and the apartment's address; a vehicle title and letters also discovered in the bedroom showed Avalos's name but a different address.

A grand jury charged both Avalos brothers in March 2013 with possession with intent to distribute methamphetamine, and charged each brother separately with possession of a firearm as a previously convicted felon. Avalos remained a fugitive for over a year before turning himself into police custody on April 27, 2014.

In February 2014, while Avalos was still at large, the district court accepted Juan's guilty pleas on both the drug and firearms charges. In his petition to plead guilty, Juan stated, "I had meth in my bedroom in a house I shared with my brother. The meth in my brother's bedroom did not belong to me." At Juan's sentencing, after his brother was in custody, Juan recanted his plea petition and told the court that "all the dope [and] guns in the apartment were mine." The district court sentenced Juan to concurrent sentences of 168 months' imprisonment on the drug-trafficking conviction and 120 months' imprisonment on the firearm conviction.

The government dismissed the firearms charge against Avalos and proceeded to trial on the drug-trafficking charge only. A first trial ended in a mistrial, but after a second trial, the jury found Avalos guilty. During trial, in addition to the evidence seized from the apartment, the government presented recordings of four calls made by Avalos on a jail telephone system. The prosecution focused on several unusual statements by Avalos. In one call, he mentioned "the square footage of tile [he] left behind," that he owed a person "half a sandwich," and that he would "give [someone] a footlong" and let that person "pay me the extra four bucks for that footlong." He

also identified several persons who owed him money. On the final call, Avalos told a woman that he had "stupid money coming in right now." When the woman warned Avalos that he was incriminating himself, he replied, "I don't give a f***. I'm the f***ing kingpin. . . . How about that for incrimination?"

Investigator Edith Andersen, an experienced narcotics officer with the Omaha Police Department, explained to the jury that drug dealers often use code words when talking about drugs or money. Investigator Andersen opined that several words used in the recorded calls, such as "tiles," "sandwiches," and "footlong," were likely code words, because "it doesn't add up if you were going to take it at face value."

Juan Avalos testified as a defense witness at his brother's trial. On direct examination, Juan testified that he took over the lease on the apartment after Jose Avalos moved out. He asserted that Jose was at the apartment on the day of the traffic stop only to collect rent. Juan further testified that the firearm and the drugs in the apartment all belonged to him. When confronted with his statement in the plea petition that the drugs in Jose's room did not belong to him, Juan asserted that the statement was drafted by his attorney, and that he signed it only to obtain a shorter sentence. Explaining his recantation of the plea petition, Juan stated: "I didn't want my brother to go to prison for my actions."

The jury found Jose Avalos guilty. The district court calculated an advisory sentencing guideline range of 360 months' to life imprisonment, and sentenced Avalos to 360 months.

II.

Avalos appeals the district court's admission of Investigator Andersen's expert testimony, contending she did not "demonstrate how her methodology and principles were readily applied to the four jail phone calls," as required by Federal Rule of

Evidence 702. Andersen had never before heard Avalos speak in code, and Avalos therefore argues that her testimony was "pure conjecture." We review the district court's admission of expert testimony for abuse of discretion. *United States v. Schwarck*, 719 F.3d 921, 923 (8th Cir. 2013).

Federal Rule of Evidence 702(a) permits the expert testimony of a witness whose "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." We have "recognized the operations of narcotics dealers as a proper field of expertise" and held that "government agents may testify to the meaning of coded drug language." *United States v. Watson*, 260 F.3d 301, 307 (8th Cir. 2001). Such testimony is often important, because "[t]here is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis." *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996). Rule 702 also requires an expert's testimony be "the product of reliable principles and methods" that the expert reliably applied to the facts of the case. Fed. R. Evid. 702(c), (d). In cases involving coded drug phrases, the rule requires that the expert base her opinion on "personal experience and training and not merely upon the hearsay testimony of non-witness drug dealers." *United States v. Placensia*, 352 F.3d 1157, 1165 (8th Cir. 2003).

The district court permissibly concluded that Investigator Andersen's testimony would be helpful to the jury in understanding the recorded phone calls. Without expert guidance, the references to "sandwiches" and "tiles" could have seemed nonsensical to a lay juror. Andersen's opinion was based on her personal experience and training applied to the facts of this case. Andersen never attempted to translate the code words used in the recorded calls and to give them specific meaning—although our precedent says that such testimony is permissible. *E.g.*, *Watson*, 260 F.3d at 307. She opined more narrowly that several words and phrases were associated with code talk used for drugs and money, an opinion she based on her

personal experience with informants, cell phone searches, and wiretaps. The district court properly admitted this testimony.

Avalos argues alternatively that the court should have excluded Andersen's testimony because its probative value was substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. Andersen's testimony was probative: Avalos maintained that he did not knowingly possess the methamphetamine discovered in his room, and Andersen's testimony about the use of code words in drug trafficking undermined this defense. Avalos contends that the code words could have been about some other topic (he suggests prostitution, robbery, or steroids). But that the meaning of the statements was arguably debatable does not show that the expert testimony was likely to confuse or mislead the jury in a way that was unfairly prejudicial. Whether the recordings were persuasive evidence of guilt was an ordinary question for the jury to determine.

Avalos next argues that the government produced insufficient evidence to support a conviction. Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence for a reasonable jury to conclude that Avalos knowingly possessed the methamphetamine. The jury reasonably could have inferred that the drugs were readily accessible in a bedroom that he occupied. Juan's effort to exculpate his brother does not preclude a conviction, as the jury could have discounted Juan's testimony based on his prior inconsistent statement and bias in favor of a sibling. Assessing the credibility of a defense witness is within the province of the jury. *United States v. Shelabarger*, 770 F.3d 714, 716 (8th Cir. 2014).

There was also sufficient evidence to conclude that Avalos intended to distribute the methamphetamine. Investigators discovered 1.3 kilograms of methamphetamine and a bank deposit receipt for $8,000. A large quantity of drugs and money is sufficient to support an inference of intent to distribute. *United States v. Orozco*, 700 F.3d 1176, 1179 (8th Cir. 2012). Avalos's description of himself as

a "kingpin" in a jailhouse telephone call likewise supported a finding that he was a large distributor of methamphetamine.

Avalos argues that his sentence of 360 months' imprisonment is substantively unreasonable, because it is considerably longer than Juan's term of 168 months. Even assuming for the sake of analysis that sentence disparities among co-conspirators could demonstrate unreasonableness, *cf. United States v. Fry*, 792 F.3d 884, 892-93 (8th Cir. 2015), the district court had ample reason to treat the brothers differently. The advisory guideline sentence for Avalos was longer than for Juan, due primarily to an extensive criminal history that qualified him as a career offender and his refusal to accept responsibility for his criminal conduct. Both defendants were sentenced within the advisory guideline ranges, and we therefore presume that the sentences were reasonable. *United States v. Williams*, 791 F.3d 809, 811 (8th Cir. 2015); *see Rita v. United States*, 551 U.S. 338, 347 (2007). The district court did not abuse its discretion.

* * *

The judgment of the district court is affirmed.

---